UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MAX PINCIONE,

        Plaintiff,

- against -

LUCIANO D'ALFONSO, et al.,

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 13, 2011

10 Civ. 3618 (PAC)

OPINION & ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

    Plaintiff Max Pincione ("Pincione"), a New York resident, brings this action against nine individuals (Luciano D'Alfonso, Guiseppe Paolone, Guiliano Milia, Berardo Ambrosi, Dario Mancini, Claudio DiGiacomo, Angelo Renzetti, Stefano Caravaggio, and Andrea Iacone[1]) ("Individual Defendants"); Banca Caripe S.p.A. ("Banca Caripe"); and a soccer team's fan club ("Ultras") (collectively, "Defendants"), all of whom are residents and domiciles of Italy or Switzerland. Pincione asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and various common-law claims, arising out of his investments and subsequent fraudulent ouster as a part-owner of the Italian football club, Pescara Calcio. He does not allege that any Defendant was physically present in New York, but rather that, individually and through agents, they transacted business in New York, committed torts within New York, and committed torts outside New York that they reasonably should have expected to, and did, cause injury in New York.

    Defendants D'Alfonso, Paolone, Milia, Ambrosi, Mancini, and Banca Caripe, appearing specially for this purpose, move to dismiss under Fed. R. Civ. P. 12(b)(2) for lack of personal

---

[1] At times on the record, Mr. Iacone's last name has also been spelled "Iaconi."

jurisdiction.[2]  They argue, *inter alia*, that none of them lives, works, owns property, or transacts business in New York, and that all alleged torts and damages occurred in Italy.

Plaintiff asserts jurisdiction based principally on his conduct here in the United States, but personal jurisdiction over foreign defendants is determined by their conduct.  Here, these defendants' conduct in the forum state is not sufficient for jurisdiction.  Accordingly, Defendants' motions to dismiss are GRANTED.

## BACKGROUND

### I. Pincione's Investments in Pescara Calcio

Pincione is a businessman, investor, and former majority owner of Pescara Calcio, S.p.A., a club that competes among the B-level flight of Italian soccer ("Pescara Calcio" or "soccer club"). (Am. Compl. ¶¶ 1, 2, 91.)  He claims that the Individual Defendants used the soccer club as a racket; and that when he became part owner and refused to participate in their schemes, they intentionally bankrupted the club to secure his ouster and devalue his investment in the club.  The Individual Defendants all reside in Italy or Switzerland and, directly or indirectly, have participated in the soccer club's operations. (Id. ¶¶ 4-6, 8-9, 11.)  Banca Caripe, a bank headquartered in Pescara, Italy, and Pescara Calcio's fan club, the Ultras, comprise the remainder of the Defendants. (Id. ¶¶ 7, 10.)

According to Pincione, in December 2006, he began speaking with nonparty Massimiliano Naddeo about purchasing an interest in Pescara Calcio. (Id. ¶ 33.)  At that time, Pincione alleges that Naddeo was working on behalf of nonparty Massimo d'Ambrosio and

---

[2] D'Alfonso, Paolone, Milia, and Ambrosi jointly submitted one motion; Banca Caripe and Mancini jointly submitted the other; neither DiGiacomo, Renzetti, Caravaggio, Iacone, nor the Ultras joined either.  The Court will consider its personal jurisdiction over the nonmoving Defendants to the extent that the arguments presented by others may apply to the nonmoving Defendants.

defendant Renzetti, (id. ¶ 32), who eventually became a co-owner of Pescara Calcio. (Id. ¶ 4). Pincione contends that at the time Naddeo solicited his investment with Pescara Calcio, he was conspiring with the Defendants "in an ongoing enterprise [to] direct[] and conduct[] the affairs of the soccer club for their own personal and fraudulent gain." (Id. ¶ 30.)

From December 2006 through January 2007, Pincione fielded dozens of phone calls and emails from Naddeo and the Individual Defendants regarding his possible investment in the soccer club. (Id. ¶¶ 32-82.) For the most part, both sides conducted the negotiation from their respective countries. (Id.) In mid-January, Pincione told Renzetti that he was interested in buying a portion of the club. (Id. ¶ 45.) The next day, Renzetti's lawyer, Stefano Ilari, emailed Pincione a formal offer to buy at least twenty percent of an entity, Pescara 70, that the investors planned to form in order to purchase Pescara Calcio. (Id. ¶ 46.). In his email, Ilari also made certain representations about the soccer club's financial strength. (Id.) Later that month, Ilari emailed Pincione the soccer club's balance sheet ("January 2007 balance sheet"), which Pincione claims "fraudulently represented the revenues and value of the soccer club." (Id. ¶ 64.) The balance sheet, which showed revenues of 1,462,915 Euros as of December 31, 2006, (id. ¶ 67), was approved by defendants Paolone, Milia, and Ambrosi—members of the soccer club's board of auditors (Id. ¶ 65). Pincione further alleges that Renzetti instructed others to send him the balance sheet, knowing it was fraudulent. (Id. ¶ 66.)

A few weeks later, Pincione, relying upon the financial information in the January 2007 balance sheet, (id. ¶ 80), transferred 414,000 Euros from a New York bank account to an account controlled by Pescara 70. (Id. ¶ 81). This investment allowed Pescara 70 to purchase Pescara Calcio, in mid-February 2007, and gave Pincione a twenty percent stake in both. (Id. ¶¶ 81, 84).

3

He became the chairman of the board of directors, a position he carried out from New York via phone or video conference. (Id. ¶ 86).

Pincione claims that Pescara 70's partners, including Renzetti and defendant DiGiacomo, called a meeting that April, and threatened to "destroy" Pincione's interest in the soccer club unless he "bought out" the other partners. (Id. ¶ 87.) At a subsequent meeting, Pincione alleges, in order to intimidate him into buying them out, DiGiacomo "physically charged Pincione [and] pushed Pincione's wife down," after which Pincione's lawyer put DiGiacomo in a headlock to subdue him. (Id. ¶ 88.)

Around the same time, Pescara Calcio's accountant, nonparty Alessandro Felizzi, valued Renzetti's twenty percent share of the soccer club at 400,000 Euros—an amount Pincione claims is "absurd" because the club was 7,000,000 Euros in debt. (Id. ¶ 89.) Renzetti, unable to come up with more money to invest into the then-failing business, lost his interest in Pescara 70. (Id. ¶¶ 89-90.) "In fear of losing his half-million dollar investment," Pincione purchased 42.08 percent[3] of the company's shares from nonparty partners, leaving him with a 62.08 percent stake in Pescara 70. (Id. ¶ 91.)

## II.     Pincione's Ouster from Pescara Calcio

Despite his controlling interest in the club and position as board chairman, Pincione claims that the soccer club was truly controlled by defendant D'Alfonso, then-mayor of Pescara, who was not employed by the club. (Id. ¶ 104.) D'Alfonso allegedly used the soccer club as a front for "pay to play" and other moneymaking schemes. (Id. ¶¶ 93,106.) According to Pincione, in exchange for money given to the club, donors received contracts from the City of Pescara, (id.

---

[3] Pincione does not specify the dollar amount of this investment.

4

¶ 93); D'Alfonso and his cohorts withdrew these funds from the club by submitting and collecting on invoices for work never performed. (Id. ¶ 105.)

After he refused to participate in these schemes, Pincione claims, the Defendants "conspired to take steps to bankrupt the soccer club and strip [him] of his investment," utilizing Italian laws about the management and finances of companies and soccer clubs. (Id. ¶ 102.) According to Pincione, if any company has less than 120,000 Euros in capital, the board of auditors can require the owner to infuse more money into the enterprise. (Id. ¶ 22.)  If the owner fails to do so, the board of auditors can appoint a new owner to fund the company and extinguish the prior owner's investment. (Id.)  Furthermore, if a soccer club goes bankrupt, Italian law gives the mayor of the city in which the club operates the power to appoint a new owner. (Id. ¶ 23.)

Pincione claims that, in several attempts to intimidate him into infusing more money into the club or resigning his position, members of the Ultras threatened his life and family. (Id. ¶¶ 113-20.)  The Ultras allegedly made these threats in person while Pincione was in Italy and via phone and text when he was in New York. (Id. ¶¶ 114, 118.)  At one point, defendant Iacone, the club's general manager, allegedly demanded $25,000 from Pincione in exchange for his promise not to direct his players to throw a match. (Id. ¶ 128.)  Pincione also claims that Iacone traded away the soccer club's better players for little or nothing, (id. ¶¶ 127-34); and "[u]pon Mayor D'Alfonso's instructions . . . leaked negative information to the media and to the soccer club's sponsors," portraying Pincione as a "thief" and "terrorist." (Id. ¶ 129).

In May 2007, Pincione allegedly wired an additional $647,000 from his New York bank account to the soccer club's bank account in response to threats from Paolone, Ambrosi, Milia, and DiGiacomo to bankrupt the soccer club. (Id. ¶¶ 122, 123.)  According to Pincione, D'Alfonso, Iacone, Milia, and defendant Mancini, vice-president of Banca Caripe at the time,

forced him to accept a 1.8 million-Euro loan to the club in exchange for a lien on Pescara Calcio and voting rights at its management meetings. (Id. ¶ 147.)

By September 2007, the soccer club was carrying approximately 2 million Euros of debt, which Mancini and the members of the board of auditors demanded Pincione extinguish. (Id. ¶ 169.) Instead of transferring funds directly to Pescara Calcio's bank account, however, Pincione alleges that he opened a bank account in Dubai, deposited 2 million Euros, and provided Defendants with letters from the bank that the funds were available to the soccer club. (Id. ¶ 172.) In response, the board of auditors allegedly asserted that these letters were fraudulent and that Pincione did not have a bank account in Dubai. (Id. ¶ 175.) Later that month, Paolone faxed Pincione a document stating that he was no longer the owner of the soccer club. (Id. ¶ 181.) In early October, Pincione alleges that DiGiacomo called him and threatened to kill him if he did not resign. (Id. ¶ 183.) After Pincione refused, Paolone, "in conspiracy with" the other Defendants, faxed him a letter "fraudulently stating that Pincione agreed to resign as Chairperson of the Board of Directors of Pescara Calcio." (Id. ¶ 184.)

### III. Procedural History

Pincione filed a Complaint on May 3, 2010, and an Amended Complaint on January 21, 2011, asserting causes of action under RICO and common law claims for conversion, fraud, and breach of fiduciary duty. The Defendants are co-owners of Pescara Calcio, Renzetti and DiGiacomo; general manager of Pescara Calcio, Iacone; directors of Pescara Calcio's board of auditors, Paolone, Milia, and Ambrosi; mayor of Pescara, D'Alfonso; Banca Caripe and its vice-president, Mancini; Pescara Calcio's fan club, the Ultras; and one of its members, Caravaggio.

Banca Caripe and Mancini moved to dismiss for lack of personal jurisdiction on February 3, 2011; followed by D'Alfonso, Paolone, Milia, and Ambrosi on February 4, 2011. (See fn 2,

supra.).  Pincione asserts jurisdiction under RICO and New York's long-arm statute, N.Y. C.P.L.R. §§ 302(a)(1), (2), (3)(ii).

## ANALYSIS

### I.      Legal Standard

The party opposing a motion to dismiss for lack of personal jurisdiction has the burden of showing that the court can exercise jurisdiction over the movant. Best Van Lines, Inc. v. Walker, 490 F.3d 239, 242 (2d Cir. 2007); see also Metropolitan Life Ins. Co v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1994). "[I]f a forum's personal jurisdiction over a defendant is questioned before discovery has commenced, in order to defeat the motion, Plaintiff only has to establish, *prima facie*, that personal jurisdiction is proper based on information in the complaint as well as supporting documentation." Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990); Thomas v. Ashcroft, 470 F.3d 491, 495 (2d Cir. 2006).

Personal jurisdiction may exist in either of its two forms—general and specific.  General jurisdiction exists when the defendant's contacts with the jurisdiction are so substantial that the individual or entity does not have to commit any particular wrongdoing in the area to be sued there. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984).  Pincione does not assert general jurisdiction.  Instead, he contends that the Court has specific jurisdiction, which lies where the dispute arises out of the defendant's actions in the forum, even if minimal. Helicopteros, 466 U.S. at 414 (citing Shaffer v. Heitner, 433 U.S. 186 (1977)).

Finally, a defendant must have "certain minimum contacts . . . such that the maintenance of the suit does not offend traditional [Due Process] notions of fair play and substantial justice." Calder v. Jones, 465 U.S. 783, 788 (1984) (quotations omitted).

## II.     Personal Jurisdiction Under the Federal RICO Statute

RICO provides that "[a]ny civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). None of the Defendants resides or can be found in New York.[4] RICO jurisdiction must be based on Defendants having an agent or transacting their affairs in the state.

Agency is a fiduciary relationship under which the principal agrees that the agent will act on the principal's behalf, subject to the principal's control, and the agent consents to do so. See, e.g., Restatement (Third) of Agency § 1.01 (2006).

Courts have interpreted the statute's "transacts his affairs" language to be synonymous with the Clayton Act's, 15 U.S.C. § 22, requirement that a party "transact[] business" in the venue. Gates v. Wilkinson, No. 01 Civ. 3145(GBD), 2003 U.S. Dist. LEXIS 9417, at *3 (S.D.N.Y. June 4, 2003). Under this definition, the business must be substantial in character, so that there is "some amount of business continuity and certainly more than a few isolated and peripheral contacts with the particular judicial district." Id. at *4 (internal quotations omitted). Accordingly, "[o]ccasional acts such as telephoning or mailing letters into the district" do not satisfy this definition of transacting business. Now Plastics, Inc., v. HPT Plastics, Inc., No. 89 Civ. 6938(PNL), 1990 U.S. Dist. LEXIS 3942, at *11 (S.D.N.Y. Apr. 10, 1990). The Court should consider whether the defendant owns property, pays taxes, work, or has offices in the state, in deciding whether he transacts his affairs there. See Lock v. Scheuer, No. 84 Civ. 7469(JFK), 1986 U.S. Dist. LEXIS 24083, at *9-10 (S.D.N.Y. June 17, 1986).

---

[4] See Am. Compl. ¶¶ 4-11 (noting that all Defendants reside, operate, and conduct their affairs in Europe).

### a.  Pincione Has Not Shown that Any Defendant Has an Agent in New York

Pincione claims that when Naddeo first contacted him, Naddeo was working on behalf of defendant Renzetti and, "upon information and belief, in conspiracy with" the remaining defendants. (Am. Compl. ¶ 32.)  The only time that Pincione claims Naddeo was in New York was when they met on December 24, 2006. (<u>See</u> <u>id.</u> ¶¶ 33-83.)  The jurisdictional requirements of § 1965(a), however, are time sensitive:  It is not sufficient that a defendant had, at some point in time, an agent in the forum; rather, he must have an agent in the jurisdiction on the day the complaint is filed. <u>See</u> <u>Gates</u>, 2003 U.S. Dist. LEXIS 9417, at *5-6.  Accordingly, even assuming that Naddeo was working on behalf of Renzetti at the time of this meeting, Pincione cannot sue in New York based on this relationship because he has not alleged that Naddea was in New York on May 3, 2010.

Pincione also argues that Naddeo was working "in conspiracy with" the Defendants at the time of the December 24th meeting.  For RICO purposes, this argument fails for the same reasons as the agency argument:  Pincione does not allege Naddeo was here in New York when the complaint was filed.  It also fails because Pincione alleges no facts supporting the existence of a conspiratorial relationship between Naddeo and the Defendants.

### a.  Plaintiff Has Not Shown that Any Defendant Transacts Affairs in New York

Pincione has failed to make a sufficient showing that any of the Defendants conducted more than occasional business, if any, in New York.  The Amended Complaint alleges that, from December 2006 through January 2007, Pincione fielded dozens of phone calls, emails, and other messages from several Defendants concerning their business deal. (Am. Compl. ¶¶ 33-83.)  While the Defendants apparently had steady contact with Pincione in New York throughout

January, these contacts do not rise to the level required by RICO.  Rather, they were minimal and were solely for the purposes of a business deal that took place in Italy.

After Pincione invested in Pescara Calcio, he occasionally joined the soccer club's meetings via video and telephone conference. (Id. ¶ 86.)  This is not, however, the kind of activity RICO contemplates.  Even though Pincione and the Defendants transacted affairs during these meetings, the mere fact that Pincione joined the meetings from New York does not mean the Defendants were transacting their affairs here.  If anything, these means of modern communications facilitated Pincione's presence in Italy, not the Defendants' presence in New York.

Pincione has not alleged that any Defendant owns property, pays taxes, works, or has offices in New York.[5]  Rather, he admits that all reside or are based in Italy or Switzerland. (Am. Compl. ¶¶ 4-11.)  Pincione, therefore, has failed to make a *prima facie* showing that the Defendants transacted their affairs in New York when he filed his complaint. See Gates, 2003 U.S. Dist. LEXIS 9417, at *7 (applying the temporal restrictions of § 1965(a)'s agency language to its transacting-affairs language).  Pincione's RICO claims are dismissed against all Defendants.

## II.     New York State's Long-Arm Statute

As to the common law claims, Pincione also failed to make a *prima facie* showing of personal jurisdiction under New York's long arm statute, which provides for specific jurisdiction over nonresidents. See Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L., 264 F.3d 32, 37 (2d Cir. 2001) ("The amenability of a foreign [defendant] to suit in a federal

---

[5] Six of the Defendants have filed affidavits with the Court denying any such connection to New York. (See Di Matteo Decl. ¶¶ 2-3; Mancini Decl. ¶ 2; Ambrosi Decl. ¶¶ 6-11; D'Alfonso Decl. ¶¶ 5-11; Milia Decl. ¶¶ 5-11; Paolone Decl. ¶¶ 5-11.)

10

court in a diversity action is determined in accordance with the law of the state where the court sits, with federal law entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee." (internal quotations omitted)). Specifically, Pincione failed to show that the Defendants (i) transacted business in the state; (ii) committed a tort within the state; or (iii) committed torts without the state that they knew or reasonably should have known, would, and did, have consequences in the state. See N.Y. C.P.L.R. §§ 302(a)(1), (2), (3)(ii).

### a. New York C.P.L.R. § 302(a)(1)—Transacting Business in the State

New York's long-arm statute provides for personal jurisdiction over a defendant who, personally or through an agent, "transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). One "transacts business" in New York when he "purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986) (quoting McKee Electric Co. v. Rauland-Borg Corp., 229 N.E.2d 604, 607 (N.Y. 1967)) (alterations in original); see also Hanson v. Denckla, 357 U.S. 235, 253 (1958). If the defendant has transacted business in the state, the claim must arise out of that activity, so that there is an "articulable nexus between the business transacted and the cause of action sued upon." McGowan v. Smith, 419 N.E.2d 321, 323 (N.Y. 1981).

No one factor is determinative. See CutCo, 806 F.2d at 365. Courts examine the totality of the defendant's conduct and activities here, id., including "whether [he] has an on-going contractual relationship with a New York corporation," and "whether the contract was negotiated or executed in New York and . . . , after executing a contract with a New York business, the defendant . . . visited New York [to] meet[] with parties to the contract regarding the relationship

11

. . . ." Sunward Electronics, Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004) (quotations omitted)). Notwithstanding, a single, purposeful transaction in New York can satisfy § 302(a)(1). See Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 166 (2d Cir. 2005). It is the quality, not quantity, of contact with New York that matters.

"[T]elephone and mail contacts do not provide a basis for jurisdiction under CPLR § 302(a)(1) unless the defendant projected himself by those means into New York in such a manner that he purposefully availed himself . . . of the benefits and protections of its laws." Wilhelmshaven Acquisition Corp. v. Asher, 810 F. Supp. 108, 112 (S.D.N.Y. 1993) (quotations and citations omitted) (alteration in original). For example, personal jurisdiction arises from active participation in a New York-based auction by bidding via telephone. See Parke-Bernet Galleries, 256 N.E.2d 506. Personal jurisdiction may arise from telephone contact when "the center of gravity of the business transacted was New York, and the defendants participated by telephone in events taking place in New York." Wilhelmshaven, 810 F. Supp. at 112.

Here, Pincione argues that the Defendants' numerous telephone calls to him in New York, as well as Naddeo's single visit to the state, confer long-arm jurisdiction under § 302(a)(1). (See Pl. Mem. at 5.) Pincione alleges that Naddeo was acting "on behalf of" Renzetti during his visit, and "in conspiracy with" the remaining Defendants. (Am. Compl. ¶ 32.) There are no factual allegations to support Pincione's bald conclusion; and he fails to make a *prima facie* showing of agency. Even if Naddeo visited New York on the Defendants' behalf, his contact with the forum is insufficient to invoke § 302(a)(1). Pincione alleges that Naddeo "met with [him] in New York and sought to persuade [him] to purchase an interest in" Pescara Calcio. (Am. Compl. ¶ 33.) Naddeo may have been physically present in New York, but the center of gravity of the business transacted was in Italy.

The same is true for the numerous telephone calls, faxes, and messages exchanged by the parties during their business relationship.[6] Nothing in the pleadings suggests that these communications, while numerous, were made with the intent to project the caller into New York and avail himself of its laws. If anything, the calls were to facilitate a business deal in Italy. In January 2007, for example, the communications almost exclusively concerned the purchase of the soccer club in Italy. (See id. ¶¶ 37-83.) Pincione refers to Pescara 70, the entity formed to purchase the soccer club, as an "S.R.L."—the Italian denotation for a public limited company—showing, at least *prima facie*, that it was formed under Italian law. (Id. ¶ 3.) To make his first investment in Pescara 70, Pincione transferred money from his New York bank account to "an account on behalf of Pescara 70." (Id. ¶ 81.) Italy was the true situs of the transaction, not New York. While Pincione may have participated from New York, he was availing himself of Italy's laws. Defendants were participating in Italy and were availing themselves of Italian law. One must do more than merely negotiate a business deal with a New York resident to project himself into New York and purposely avail himself of its laws. The communications were aimed at Pincione, rather than New York. This is insufficient to trigger personal jurisdiction under § 302(a)(1).

      b.  **New York C.P.L.R. § 302(a)(2)—Tortious Conduct Within the State**

Section 302(a)(2) provides for personal jurisdiction over anyone who personally or through an agent commits a tortious act within the state. As Defendants argue, New York courts require a tortfeasor's physical presence in the state when the tort is committed. (See Individual Defs.' Mem. of Law in Support of Mot. to Dismiss ("Def. Mem.") at 11; Banca Caripe & Dario Mancini's Mem. of Law in Support of Mot. to Dismiss ("Caripe Mem.") at 8-9.) In Longines-

---

[6] Pincione claims he received some 80 telephone calls, faxes, and emails in January 2007 alone. (Pl. Mem. at 5.)

Wittnauer Watch Co. v. Barnes & Reinecke, the Court of Appeals held that 302(a)(2) "covers only a tortious act committed (by a nondomiciliary) in this State." 15 N.Y.2d 443, 464 (1965); see also Platt Corp. v. Platt, 217 N.E.2d 134 (N.Y. 1966) (reaffirming Longines). Initially, this District read Longines to require that the defendant commit the tort while physically in New York. See Lynn v. Cohen, 359 F. Supp. 565, 568 (S.D.N.Y. 1973); Paul v. Premier Elec. Construction Co., 576 F. Supp. 384, 389 (S.D.N.Y.1983). Some other courts had a more expansive reading, reasoning that a physical-presence requirement makes little sense when technology makes it possible to commit a tort within the state while physically outside it. See Banco Nacional Ultramarino, S.A. v. Chan, 641 N.Y.S.2d 1006, 1009 (N.Y. Sup. Ct. 1st Dep't 1996); see also Pilates, Inc. v. Pilates Institute, Inc., 891 F. Supp. 175, 182 (S.D.N.Y. 1995). The Second Circuit has explicitly adopted the earlier view. Bensusan Restaurant Corp. v. King, 126 F.3d 25, 29 (2d Cir. 1997) (noting that "judges who [adopt the more liberal interpretation of § 302(a)(2)] are in the minority. In the absence of some indication by the New York Court of Appeals that its decisions in [Longines] and Platt . . . no longer represent the law of New York, we believe it would be impolitic for this Court to hold otherwise.").

Pincione has not alleged or shown that the Defendants committed any tortious act while physically present in New York. Notwithstanding Bensusan, he argues that § 302(a)(2) jurisdiction is appropriate because the Defendants committed torts in the state, while physically present in Italy (*i.e.*, sending the fraudulent data regarding the soccer club's finances). (See Pl. Mem. at 9, 11.) Though they may occur in the same place, the location of the tortious act (*i.e.*, the tortfeasor's physical locale) is distinct from the location of the tort (*i.e.*, the injury). Longines and Bensusan make clear that § 302(a)(2) requires the tortious act to occur in New York.

The Amended Complaint also alleges that, when Naddeo met Pincione in New York, he was working "on behalf of Defendant Renzetti" and "in conspiracy with" the other Defendants. (Am. Compl. ¶¶ 32, 33.) While certain tortious acts of a coconspirator in New York may be attributed to an out-of-state defendant to obtain personal jurisdiction over him, Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys., Inc., 10 F. Supp. 2d 334, 342 (S.D.N.Y. 1998), "the bland assertion of conspiracy or agency is insufficient to establish jurisdiction" under § 302(a)(2). Lehigh Valley Indus., Inc. v. Birenbaum, 527 F.2d 87, 93-94 (2d Cir. 1975); see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 793 (2d Cir. 1999). Pincione offers no specific facts to support his allegation that Naddeo was working with the Defendants when he met Pincione in New York; and the Defendants assert that they did not authorize Naddeo to be their agent. (See Di Matteo Decl. ¶ 6; Mancini Decl. ¶ 5; Ambrosi Decl. ¶ 13; D'Alfonso Decl. ¶ 13; Milia Decl. ¶ 13; Paolone Decl. ¶ 13.) Accordingly, Pincione's conspiracy-based arguments fail.

### c. New York C.P.L.R. § 302(a)(3)(ii)—Tortious Conduct Without the State[7]

Finally, Pincione asserts personal jurisdiction under C.P.L.R. § 302(a)(3)(ii), which applies to anyone who personally or through an agent commits a tort without the state, causing injury within the state, if that person "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." Pincione argues that the Defendants' torts caused him injury within the state, because he relied on the fraudulent January 2007 balance sheet while he was in New York. He

---

[7] Although the Amended Complaint does not assert C.P.L.R. § 302(a)(3)(i) as a basis for jurisdiction, (Am. Compl. ¶ 16), Pincione's memorandum of law argues that jurisdiction lies under this section, which applies to a tortious act outside the state if the defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state." (Pl. Mem. at 12). In any event, jurisdiction fails under 302(a)(3)(i) for the same reasons as under 302(a)(3)(ii).

also argues that their threats of violence and conversion of the soccer team's funds caused him injury in the state because Pincione operated the club from New York, and "all of the funds he invested were from New York banks." (Pl. Mem. at 13.)  Defendants contend that any alleged injury was sustained in Italy, regardless of Pincione's location in New York. (See Def. Mem. at 13-14; Caripe Mem. at 9-11.)

To determine where Pincione suffered injury, the Court looks to the situs of injury, "locat[ing] the original event which caused the injury." Bank Brussels Lambert, 171 F.3d at 791 (quotations omitted).  The "original event is . . . generally distinguished not only from the initial tort but from the final economic injury and the felt consequences of the tort." Id.; Mareno v. Rowe, 910 F.2d 1043, 1046 (2d Cir. 1990) ("[T]he situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff.").  Rather, it is the location of the first effect of the tort that ultimately produced the final economic injury. DiStefano v. Carozzi North America, Inc., 286 F.3d 81, 84-85 (2d Cir. 2001); Bank Brussels Lambert, 171 F.3d at 792.  For example, where a group of doctors committed malpractice in Connecticut, and the patient-plaintiff felt the physical injury in New York, the "original event"—and thus the situs of the injury—were outside New York. See Hermann v. Sharon Hosp., Inc., 522 N.Y.S.2d 581 (N.Y. App. Div. 2d Dep't 1987).

Generally, with commercial torts—those that cause monetary rather than physical injury—the situs of the injury is New York if the plaintiff raises the inference that the tortious conduct caused him to lose business or customers within the state. See Am. Network, Inc. v. Access Am./Connect Atlanta, Inc., 975 F. Supp. 494, 497 (S.D.N.Y. 1997); Sybron Corp. v. Wetzel, 385 N.E.2d 1055, 1059 (N.Y. 1978) (finding § 302(a)(3)(ii) jurisdiction over foreign defendant, based on its hiring of a former employee of New York-based plaintiff, allegedly in

16

order to access plaintiff's trade secrets, which likely caused injury in the form of lost customers in the state).  Here, however, the underlying events took place in Italy, not New York.  While there may be financial consequences in New York, due to Plaintiff's fortuitous location, that is insufficient to confer jurisdiction under § 302(a)(3). Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 209 (2d Cir. 2001).

Here, Pincione's strongest argument for jurisdiction is that the allegedly fraudulent financial data he received and relied on in New York induced him to make his initial financial investment in Pescara 70.  This disbursement of funds, from Pincione's New York bank account, "was the first step in the process that generated the ultimate economic loss." Bank Brussels Lambert, 171 F.3d at 792.  Since Pincione received the second balance sheet, which he does not allege to be fraudulent, before he made his second investment in the soccer club, this and any subsequent investments cannot be attributed to the first, fraudulent balance sheet. (Am. Compl. ¶¶ 91, 99.)  Pincione's other theory of jurisdiction—conversion of his assets in Italy—is unavailing because these assets were not located in New York.[8]  Any funds (money deposited in Italian banks on the club's behalf) or assets (interest in the soccer club) the Defendants allegedly stole were converted in Italy, from an Italian bank or under the color of Italian law, respectively.  Pincione's only viable theory of § 302(a)(3)(ii) jurisdiction, therefore, is that the allegedly fraudulent January 2007 balance sheet caused him injury in New York.

Section 302(a)(3)(ii) also requires that the tortfeasor (1) expect or reasonably should expect the act to have consequences in the state; and (2) derive substantial revenue from interstate or international commerce.  Pincione satisfies the first prong, alleging that Renzetti,

---

[8] Pincione only asserted RICO claims, not common law claims, based on the alleged threats against him. (See Am. Compl. ¶¶ 190-248.)

Paolone, Milia, and Ambrosi "knew the balance sheet contained fraudulent information and intentionally instructed that the fraudulent financial information be sent to Pincione." (Am. Compl. ¶ 66). Pincione makes no such allegation concerning the Ultras, Iaconi, D'Alfonso, Caravaggio, or DiGiacomo (although he does assert the fraud claim based on the January 2007 balance sheet against DiGiacomo, (Am. Compl. ¶ 225)). Regarding Banca Caripe and its then-vice-president Mancini, Pincione fails to allege or show that they had anything to do with the January 2007 balance sheet—the only allegedly tortious act with injury in New York. Additionally, as discussed, Pincione's bland assertion that "upon information and belief" these Defendants conspired with the others is insufficient to made a *prima facie* showing of jurisdiction.

The revenue requirement "is designed to narrow the long-arm reach to preclude the exercise of jurisdiction over nondomiciliaries who might cause direct, foreseeable injury within the State but whose business operations are of a local character." LaMarca v. Pak-Mor Mfg. Co., 735 N.E.2d 883, 886-87 (N.Y. 2000) (internal quotations and citations omitted); Ingraham v. Carroll, 687 N.E.2d 1293, 1296 (N.Y. 1997) (describing the requirement as essentially a "'bigness requirement' designed to assure that the defendant is 'economically big enough' to defend suit in New York" (quoting David D. Siegel, Siegel's New York Practice § 88, at 136 (2d ed.))). For example, a physician who only saw patients in Vermont did not derive substantial revenue from interstate commerce, even though he treated patients from other states. Ingraham, 687 N.E.2d at 1296. By contrast, "[a] Texas corporation with a manufacturing facility in Virginia is inherently engaged in interstate commerce." LaMarca, 735 N.E.2d at 887. Moreover, if a corporation derives substantial revenue from interstate or international commerce, that revenue cannot be imputed to the company's non-shareholding officers. Siegel v. Holson Co.,

18

768 F. Supp. 444, 446 (S.D.N.Y. 1991); see also Bulk Oil (USA), Inc. v. Sun Oil Trading Co., 584 F. Supp. 36, 41 (S.D.N.Y. 1983) ("[I]t is the individual, and not his corporate employer, who must derive 'substantial revenue' for jurisdiction to attach under section 302(a)(3)(ii).").

Pincione argues that "Pescara Calcio derived significant revenue from international commerce [because the] Plaintiff invested more than $1.2 million of his American dollars into Pescara Calcio. The compensation of Iaconi, Milia, Ambrosi, and Paolone came from Plaintiff's international investment." (Pl. Mem. at 13.)  Pincione does not allege or show that Iaconi, Milia, Ambrosi, or Paolone ever individually derived substantial income from international commerce. Any funds they may have earned came from the soccer club, a wholly-owned subsidiary of Pescara 70.  While it is possible to attribute a portion of these Defendants' income to Pincione, at least two entities, of which they are not alleged to be shareholders—Pescara 70 and Pescara Calcio—stand between them and Pincione's investment.  Accordingly, the Court has no personal jurisdiction over any of these Defendants.

With respect to the Defendants who knew about the fraudulent balance sheet, as Pincione alleges, only Renzetti arguably could have derived substantial income from international commerce by virtue of his position as a shareholder in Pescara 70.  The revenue requirement, however, contemplates a vendor placing goods or services in the interstate or international stream of commerce, not a sole investor placing his own funds in a foreign company.  Renzetti received revenue from an investor, not from "sales of goods or services in interstate [or international] commerce." Ziegler, Ziegler & Assocs. LLP v. China Digital Media Corp., No. 05 CV 4960(LAP), 2010 WL 2835567, at *5 (S.D.N.Y. July 13, 2010) ("Capital infused into a corporation by means of stock purchases cannot be considered revenue *per se,* because it is not profit from sales. . . .  [T]here is no cognizable authority or other persuasive argument to indicate

19

that investment capital should constitute 'revenue' from interstate [or international] commerce within the plain meaning of § 302(a)(3)(ii)." (quotations omitted). Accordingly, the Court finds that Pincione failed to satisfy the requirements of § 302(a)(3)(ii) as to each Defendant.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are GRANTED, and the Amended Complaint is dismissed. The Clerk of Court is directed to close this case.

Dated: New York, New York
       September 13, 2011

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge